IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| In the Matter of: | ) | No. 19 B 30473 |
| | ) | Chapter 11 |
| | ) | |
| 4700 South Ashland, LLC | ) | Hon. Deborah L. Thorne |
| | ) | |
| Debtor. | ) | |
| | ) | |

## NOTICE OF MOTION AND MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR RELIEF FROM THE AUTOMATIC STAY

PLEASE TAKE NOTICE that on Tuesday, March 10, 2020 at 9:30 a.m., I shall appear in Courtroom 613 of the United States Bankruptcy Court, 219 S. Dearborn St., Chicago, Illinois, and present the Motion to Dismiss, a copy of which is attached and served upon you. You may appear and be heard if you so choose.

I certify under penalty of perjury that this office caused a copy of this Notice of Motion and Motion to Dismiss to be delivered to the persons named below by U.S. Mail or by the methods indicated on February 27, 2020.

FIRST MIDWEST BANK

*/s/ Jillian S. Cole*
Taft Stettinius & Hollister LLP
111 E. Wacker Dr., #2800
Chicago, Illinois 60601
jcole@taftlaw.com

| U.S. Mail | CM/ECF: |
|---|---|
| Anna Nalls CPA PC<br>3415 Church Street<br>Evanston, IL 60203-1714<br><br>**See Attached Service List** | Jeffrey C. Dan on behalf of 4700<br>jdan@cranesimon.com<br>sclar@cranesimon.com<br>mjoberhausen@cranesimon.com<br><br>Patrick S. Layng<br>USTPRegion11.ES.ECF@usdoj.gov |

**CONTINUED SERVICE LIST:**

| | |
|---|---|
| 4700 S. Ashland LLC<br>Attn: Patrick Kane<br>500 West Superior St., Suite 1407<br>Chicago, Illinois 60654-8142 | Patrick Kane<br>500 W. Superior St., #1407<br>Chicago, IL 60654-8142 |
| William Platt<br>4725 N. Western Ave., #220<br>Chicago, Illinois 60625-3533 | William J. Kane<br>1700 Landmark Road<br>Aurora, IL 60506-1167 |
| Erwin Law LLC<br>Attn: Daniel Hawkins<br>4043 N. Ravenswood Ave., #208<br>Chicago, IL 60613-2435 | Robert Chapman, Esq.<br>Chapman Spingola LLP<br>190 S. LaSalle St., #3850<br>Chicago, IL 60603-3431 |
| City of Chicago<br>121 N. LaSalle Street<br>Chicago, IL 60602-1266 | Cook County Treasurer<br>118 N. Clark, Suite 112<br>Chicago, IL 60602-1590 |
| Department of the Treasury<br>IRS<br>P.O. Box 7346<br>Philadelphia, PA 19101-7346 | Internal Revenue Service<br>Mail Stop 5014CHI<br>230 S. Dearborn St., Rm. 2600<br>Chicago, IL 60604-1705 |
| Illinois Secretary of State<br>213 State Capitol<br>Springfield, IL 62756-0001 | FAMSA<br>4700 S. Ashland Avenue<br>Chicago, IL 60609-4231 |

26802464.1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| In the Matter of:<br><br>4700 South Ashland, LLC<br><br>Debtor. | No. 19 B 30473<br>Chapter 11<br><br>Hon. Deborah L. Thorne |

### FIRST MIDWEST BANK'S, AS SUCCESSOR-IN-INTEREST TO BRIDGEVIEW BANK GROUP, MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR RELIEF FROM THE AUTOMATIC STAY

First Midwest Bank, ("First Midwest") as successor-in-interest to Bridgeview Bank Group ("Bridgeview"), by and through its attorneys, Taft Stettinius & Hollister LLP, submits its Motion to Dismiss the bankruptcy case filed by 4700 South Ashland, LLC (the "Debtor"), or in the alternative, for Relief From the Automatic Stay (the "Motion"), and in support thereof states as follows:

### I. JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the U.S. District Court for the Northern District of Illinois, Eastern Division. This matter is a core proceeding under 28 U.S.C. § 157(b)(2), and venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested in the Motion is 11 U.S.C. § 1112(b), 11 U.S.C. 362(d)(1) and (d)(3).

### II. BACKGROUND

**A.    The Loans**

The Construction Loan

On or about December 23, 2005, the Debtor borrowed $3,200,000.00 from Bridgeview (the "Construction Loan") for business purposes. The Construction Loan is evidenced by a promissory note dated December 23, 2005, executed and delivered by the Debtor in favor of Bridgeview, in

the principal amount of $3,200,000.00 (the "Construction Note"). A true and accurate copy of the Construction Note is attached hereto as Exhibit 1. The Construction Loan is also evidenced by a Business Loan Agreement (the "Business Loan Agreement"), dated December 23, 2005, executed by the Debtor and Bridgeview. A true and accurate copy of the Business Loan Agreement is attached hereto as Exhibit 2.

Contemporaneously with the execution of the Construction Note and the Business Loan Agreement, the Debtor executed a mortgage in favor of Bridgeview on the property located at 4700 S. Ashland, Chicago, Illinois (the "Property"), to secure the Construction Note (the "First Mortgage"). A true and accurate copy of the First Mortgage is attached hereto as Exhibit 3. The Property is a commercial office building that has been designated as a landmark by the City of Chicago.

On or about March 22, 2006, the Construction Loan was renewed and increased (the "Construction Renewal Loan"), which is evidenced by, *inter alia*, a promissory note dated March 22, 2006, executed and delivered by the Debtor in favor of Bridgeview, in the principal amount of $8,500,000.00 (the "Construction Renewal Note"). A true and accurate copy of the Construction Renewal Note is attached hereto as Exhibit 4. The Construction Renewal Loan is also evidenced by, *inter alia*, a Construction Loan Agreement executed between the Debtor and Bridgeview (the "Construction Loan Agreement"). A true and accurate copy of the Construction Loan Agreement is attached hereto as Exhibit 5.

Contemporaneously with the execution of the Construction Renewal Note and the Loan Agreement, the Debtor executed an Amendment of Mortgage to secure the Construction Renewal Note (the "Amendment to First Mortgage"). A true and accurate copy of the Amendment to First Mortgage is attached hereto as Exhibit 6.

2

On or about March 21, 2007, the Debtor, among others, executed a Consolidated Amendment to Mortgage Loan in favor of Bridgeview, pursuant to which, *inter alia*, the maturity date of the Renewal Note was extended to October 1, 2007 (the "Consolidated First Mortgage," and sometimes collectively with the First Mortgage and the Amendment to First Mortgage, the "Amended First Mortgage"). A true and accurate copy of the Consolidated First Mortgage is attached hereto as Exhibit 7. On or about October 1, 2007, the Debtor, among others, executed a Mortgage Loan Extension in favor of Bridgeview pursuant to which, *inter alia*, the maturity date of the Construction Renewal Note was extended to January 18, 2008 (the "First Extension to Amended First Mortgage"). A true and accurate copy of the First Extension to Amended First Mortgage is attached hereto as Exhibit 8.

On or about January 15, 2008, the Debtor, among others, executed a Second Mortgage Loan Extension in favor of Bridgeview (the "Second Extension to Amended First Mortgage"), pursuant to which, *inter alia*, the maturity date of the Construction Renewal Note, as extended by the First Extension to Amended First Mortgage, was extended to April 15, 2008. A true and accurate copy of the Second Extension of Amended First Mortgage is attached hereto as Exhibit 9.

On or about April 15, 2008, the Debtor executed an Amended and Restated Promissory Note, in the principal amount of $11,000,000.00 (the "Amended Construction Renewal Note"), in favor of Bridgeview. A true and accurate copy of the Amended Construction Renewal Note is attached hereto as Exhibit 10. Contemporaneously with the execution of the Amended Construction Renewal Note, the Debtor and the Lender executed a Supplemental Loan Agreement in favor or Bridgeview which, *inter alia*, amended certain definitions defined in the Loan

Agreement (the "Amended Loan Agreement"). A true and accurate copy of the Amended Loan Agreement is attached hereto as Exhibit 11.

Also contemporaneously with the execution of the Amended Construction Renewal Note, the Debtor, among others, executed a Third Mortgage Loan Extension (the "Third Extension to Amended First Mortgage") in favor of Bridgeview to, *inter alia*, reflect that the maturity date of the Amended Construction Renewal Note was April 15, 2019. A true and accurate copy of the Third Extension to Amended First Mortgage is attached hereto as Exhibit 12.

On or about April 15 2009, the Debtor, among others, executed a Fourth Mortgage Loan Extension in favor of Bridgeview (the "Fourth Extension to Amended First Mortgage") pursuant to which, *inter alia*, the maturity date of the Amended Construction Renewal Note was extended to October 5, 2009. A true and accurate copy of the Fourth Extension to Amended First Mortgage is attached hereto as Exhibit 13.

On or about October 5, 2009, the Debtor, among others, executed a Fifth Mortgage Loan Extension in favor of Bridgeview (the "Fifth Extension to Amended First Mortgage") pursuant to which, *inter alia*, the maturity date of the Amended Construction Renewal Note, as extended by the Fourth Extension to Amended First Mortgage, was extended to March 5, 2010. A true and accurate copy of the Fifth Extension to Amended First Mortgage is attached hereto as Exhibit 14.

On or about March 5, 2010, the Debtor, among others, executed a Sixth Mortgage Loan Extension in favor of Bridgeview (the "Sixth Extension to Amended First Mortgage") pursuant to which, *inter alia*, the maturity date of the Amended Construction Renewal Note, as extended by the Fourth and Fifth Extensions to Amended First Mortgage, was extended to October 1, 2010. A true and accurate copy of the Sixth Extension to Amended First Mortgage is attached hereto as Exhibit 15.

On or about October 5, 2010, the Debtor, among others, executed a Seventh Mortgage Loan Extension in favor of Bridgeview (the "Seventh Extension to Amended First Mortgage") pursuant to which, *inter alia*, the maturity date of the Amended Construction Renewal Note, as extended by the Fourth, Fifth and Sixth Extensions to Amended First Mortgage, was extended to December 5, 2010. A true and accurate copy of the Seventh Extension to Amended First Mortgage is attached hereto as Exhibit 16. On or about December 5, 2010, the Debtor, among others, executed an Eighth Mortgage Loan Extension in favor of Bridgeview (the "Eighth Extension to Amended First Mortgage") pursuant to which, *inter alia*, the maturity date of the Amended Construction Renewal Note, as extended by the Fourth, Fifth, Sixth and Seventh Extensions to Amended First Mortgage, was extended to April 15, 2011. A true and accurate copy of the Eighth Extension to Amended First Mortgage is attached hereto as Exhibit 17.

On or about April 15, 2011, the Debtor, among others, executed an Ninth Mortgage Loan Extension in favor of Bridgeview (the "Ninth Extension to Amended First Mortgage") pursuant to which, *inter alia*, the maturity date of the Amended Construction Renewal Note, as extended by the Fourth, Fifth, Sixth, Seventh and Eighth Extensions to Amended First Mortgage, was extended to July 15, 2011. A true and accurate copy of the Ninth Extension to Amended First Mortgage is attached hereto as Exhibit 18.

On or about July 15, 2011, the Debtor, among others, executed an Tenth Mortgage Loan Extension in favor of Bridgeview (the "Tenth Extension to Amended First Mortgage") pursuant to which, *inter alia*, the maturity date of the Amended Construction Renewal Note, as extended by the Fourth, Fifth, Sixth, Seventh, Eighth and Ninth Extensions to Amended First Mortgage, was extended to October 15, 2011. A true and accurate copy of the Tenth Extension to Amended First Mortgage is attached hereto as Exhibit 19.

On or about October 15, 2011, the Debtor, among others, executed an Eleventh Mortgage Loan Extension in favor of Bridgeview (the "Eleventh Extension to Amended First Mortgage") pursuant to which, *inter alia*, the maturity date of the Amended Construction Renewal Note, as extended by the Fourth, Fifth, Sixth, Seventh, Eighth, Ninth and Tenth Extensions to Amended First Mortgage, was extended to January 15, 2012. A true and accurate copy of the Eleventh Extension to Amended First Mortgage is attached hereto as Exhibit 20.

On or about March 12, 2012, the Debtor, among others executed a Replacement Note (the "Second Amended Construction Renewal Note") to, *inter alia*, reflect that the principal balance of the Construction Renewal Loan had decreased to $4,718,000.00. A true and accurate copy of the Second Amended Construction Renewal Note is attached hereto as Exhibit 21.

Pursuant to the terms of the Second Amended Construction Renewal Note, the Debtor, among others, was obligated to, *inter alia*, make certain monthly payments due under the Second Amended Construction Renewal Note beginning on March 5, 2012, with all subsequent payments to be due on the same day of each month thereafter. The entire outstanding balance under the Second Amended Renewal Note, including all accrued interest thereon, plus all other sums due and payable, was to be made on February 5, 2014.

On or about March 1, 2014, the Debtor, among others, executed a Twelfth Mortgage Loan Extension in favor of Bridgeview (the "Twelfth Extension to Amended First Mortgage") pursuant to which, *inter alia*, the maturity date of the Second Amended Construction Renewal Note, was extended to June 5, 2015. A true and accurate copy of the Twelfth Extension to Amended First Mortgage is attached hereto as Exhibit 22. On or about June 1, 2015, the Debtor, among others, executed a Thirteenth Mortgage Loan Extension in favor of Bridgeview (the "Thirteenth Extension to Amended First Mortgage") pursuant to which, *inter alia*, the maturity date of the Second

Amended Construction Renewal Note, as extended by the Twelfth Extension to Amended First Mortgage, was extended to June 1, 2016. A true and accurate copy of the Thirteenth Extension to Amended First Mortgage is attached hereto as Exhibit 23.

On or about June 1, 2016, the Debtor, among others, executed a Fourteenth Mortgage Loan Extension in favor of Bridgeview (the "Fourteenth Extension to Amended First Mortgage") pursuant to which, *inter alia*, the maturity date of the Second Amended Construction Renewal Note, as extended by the Twelfth and Thirteenth Extensions to Amended First Mortgage, was extended to October 5, 2016. A true and accurate copy of the Fourteenth Extension to Amended First Mortgage is attached hereto as Exhibit 24.

On or about October 5, 2016, the Debtor, among others, executed a Fifteenth Mortgage Loan Extension in favor of Bridgeview (the "Fifteenth Extension to Amended First Mortgage") pursuant to which, *inter alia*, the maturity date of the Second Amended Construction Renewal Note, as extended by the Twelfth, Thirteenth and Fourteenth Extensions to Amended First Mortgage, was extended to February 5, 2017. A true and accurate copy of the Fifteenth Extension to Amended First Mortgage is attached hereto as Exhibit 25. On or about February 5, 2017, the Debtor, among others, executed a Sixteenth Mortgage Loan Extension in favor of Bridgeview (the "Sixteenth Extension to Amended First Mortgage") pursuant to which, *inter alia*, the maturity date of the Second Amended Construction Renewal Note, as extended by the Twelfth, Thirteenth, Fourteenth and Fifteenth Extensions to Amended First Mortgage, was extended to August 5, 2017. A true and accurate copy of the Sixteenth Extension to Amended First Mortgage is attached hereto as Exhibit 26.

On or about August 5, 2017, the Debtor, among others, executed a Seventeenth Mortgage Loan Extension in favor of Bridgeview (the "Seventeenth Extension to Amended First Mortgage")

pursuant to which, *inter alia*, the maturity date of the Second Amended Construction Renewal Note, as extended by the Twelfth, Thirteenth, Fourteenth, Fifteenth and Sixteenth Extensions to Amended First Mortgage, was extended to August 5, 2018. A true and accurate copy of the Seventeenth Extension to Amended First Mortgage is attached hereto as Exhibit 27.

On or about August 5, 2018, the Debtor, among others, executed an Eighteenth Mortgage Loan Extension in favor of Bridgeview (the "Eighteenth Extension to Amended First Mortgage," and collectively with the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, Fifteenth, Sixteenth and Seventeenth Extensions to Amended First Mortgage, the "Extensions to Amended First Mortgage") pursuant to which, *inter alia*, the maturity date of the Second Amended Construction Renewal Note, as extended by the Twelfth, Thirteenth, Fourteenth, Fifteenth, Sixteenth and Seventeenth Extensions to Amended First Mortgage, was extended to April 5, 2019. A true and accurate copy of the Eighteenth Extension to Amended First Mortgage is attached hereto as Exhibit 28.

The Debtor is in default under the terms of the Second Amended Construction Renewal Note, as amended by the Extensions to Amended Mortgage (collectively referred to herein as the "Final Construction Note") because the Debtor has failed and refused, and continues to fail and refuse, to pay all amounts due under the Final Construction Note after it matured on April 5, 2019.

### The Revolving Loan

On or about October 5, 2018, the Debtor borrowed $250,000.00 from Bridgeview (the "Revolving Loan") for business purposes. The Revolving Loan is evidenced by a promissory note dated October 5, 2018, executed and delivered by the Debtor in favor of Bridgeview, in the principal amount of $250,000.00 (the "Revolving Note"). A true and accurate copy of the Revolving Note is attached hereto as Exhibit 29. Contemporaneously with the execution of the

Revolving Note, the Debtor executed a second mortgage in favor of Bridgeview on the Property to secure the Revolving Note ("Second Mortgage"). A true and accurate copy of the Second Mortgage is attached hereto as Exhibit 30.

Pursuant to the terms of the Revolving Note, the Debtor was obligated to, inter alia, make certain monthly payments due under the Revolving Note beginning on November 5, 2018, with all subsequent payments to be due on the same day of each month thereafter. The entire outstanding balance under the Revolving Note, including all accrued interest thereon, plus all other sums due and payable, was to be made on October 4, 2019.

The Debtor defaulted under the terms of the Revolving Note because of the Debtor's default under the Final Construction Note and because the Debtor failed to repay the Revolving Note upon maturity.

**B.    The Foreclosure Litigation**

As a result of the defaults under the Final Construction Note and the Revolving Note (sometimes collectively referred to herein as the "Notes"), the Amended First Mortgage and the Second Mortgage (sometimes collectively referred to herein as the "Mortgages"), First Midwest filed a Complaint to Foreclose Mortgages and for Other Relief in the Circuit Court of Cook County, Illinois, Chancery Division, as Case No. 2019 CH 08352 (the "Foreclosure Action"). In the Foreclosure Action, First Midwest filed a Motion for Appointment of Receiver (the "Receiver") to take control and possession of the Property (the "Receiver Motion"). After the Receiver Motion was fully briefed, but just three days before the Court was to rule on the Receiver Motion, the Debtor filed for Chapter 11 Bankruptcy relief.

C. **The Bankruptcy Filing**

On October 25, 2019 (the "Petition Date"), the Debtor filed for relief under Chapter 11 of the United States Bankruptcy Code ("Code"), and designated its case a single asset real estate pursuant to 11 U.S.C. § 101(51B)). On or about November 8, 2019, the Debtor filed its Schedules and Statement of Financial Affairs (collectively, the "Schedules"). In the Schedules, the Debtor lists First Midwest as its only secured creditor. The Debtor also, in the Schedules, lists six unsecured creditors. The two largest unsecured creditors are Patrick Kane and William Platt (the "Insiders") both of whom are guarantors of the Loans and officers of the Debtor.[1] The Schedules also reveal that the Debtor has no employees, is not collecting any rent from the Property, and is not earning any money from any source.

Thereafter, on January 23, 2020, the Debtor filed its Chapter 11 Plan of Reorganization (the "Plan"). In the Plan, the Debtor proposes to sell the Property at some unknown point in time. No other details about the proposed sale are mentioned in the Plan.

### III.    ARGUMENT

I. <u>The Debtor's bankruptcy case should be dismissed pursuant to § 11 U.S.C. 1112(b)</u>

Section 305(a) of the Bankruptcy Code provides that the Court may dismiss a case at any time, after notice and a hearing, if the interests of creditors and the debtor would be better served by such dismissal. Section 1112(b) of the Bankruptcy Code provides that the Court <u>shall</u> dismiss (or convert) a case for cause when it is in the best interest of creditors and the estate.

While there is no express provision in the Bankruptcy Code, it is well-established that "good faith is a threshold prerequisite to securing Chapter 11 relief, and that the lack of such good faith constitutes 'cause', sufficient for dismissal under 11 U.S.C. § 1112(b)." *In re Madison Hotel*

---

[1] The few other listed unsecured creditors are for negligible amounts.

*Assocs.*, 749 F.2d 410, 426 (7th Cir. 1984); *see also In re Mandalay Shores Coop. Hous. Ass'n*, 63 B.R. 842, 847 (N.D. Ill. 1986) (noting that the list of "for cause" grounds for dismissal under § 1112(b) of the Bankruptcy Code is non-exhaustive).

The Seventh Circuit has clearly stated that "cause" for dismissal exists when a Chapter 11 petition is filed in bad faith. See, *In re Jartran, Inc.*, 886 F.2d 859, 867 (7th Cir. 1989) ("Courts have sensibly considered bad faith to be an acceptable basis for conversion or dismissal."); *see also, In re Madison Hotel*, 749 F.2d at 426; *In re 4C Solutions, Inc.*, 289 B.R. 364, 366 (Bankr. C.D. Ill. 2003) (recognizing that "it is well established that a Chapter 11 petition is subject to dismissal for cause if not filed in good faith."); and *In re 801 S. Wells Street Ltd. P'ship*, 192 B.R. 718 (Bankr. N.D. Ill. 1996) (stating that "courts have dismissed Chapter 11 cases pursuant to § 1112(b) on the ground that they were filed in bad faith.").

In determining if a petition was filed in bad faith, courts consider the *intent* of the debtor in filing its petition:

> [C]ourts may consider any factors which evidence "an intent to abuse the judicial process and the purposes of the reorganization provisions" or in particular, factors which evidence that the petition was filed "to delay or frustrate the legitimate efforts of secured creditors to enforce their rights."

*In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988) (quoting *In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984)); *see also, Singer Furniture Acquisition Corp. v. SSMC, Inc. NV*, 254 B.R. 46, 52 (D.M.D. Fla. 2002). The debtor's intent need not be malicious to warrant dismissal or conversion of the case. *In re McCormick Road Assoc.*, 127 B.R. 410, 415 (N.D. Ill. 1991); *and In re Syed*, 238 B.R. 133, 141 (Bankr. N.D. Ill. 1999) (recognizing in a single asset bankruptcy case that "bad faith" filing had occurred where the debtor was unable to secure sufficient financing to rehabilitate the real estate as needed to fund a reorganization plan, and that

11

"[b]ad faith is not the same as ill will or bad intent, but may be objectively inferred from the impossibility of confirming a proposed plan").

Courts have recognized that while the debtor's motivation may simply be to preserve assets that are in jeopardy of being taken by secured creditors, "to the extent that the legitimate ends of bankruptcy law are frustrated by the debtor's actions," there exists sufficient abuse to warrant dismissal. *In re Grieshop*, 63 B.R. 657, 663 (N.D. Ind. 1986); *see also, In re Synbdicom Corp.*, 268 B.R. 26 (Bankr. S.D.N.Y. 2001) (citing to *Grieshop* with approval and recognizing that "bad faith may not be summarily equated with malfeasance and abuse. A debtor may simply be motivated by a desire to use any means at hand to preserve assets that are in jeopardy. Such acts of desperation do not necessarily imply active malfeasance directed at a creditor. They may, however, illustrate a misuse, as opposed to abuse, of bankruptcy procedure to the extent that the legitimate ends of bankruptcy law are frustrated").

In considering whether good faith exists, Courts have identified certain factors that, when present, indicate the existence of bad faith. Towards that end, the court in *Grieshop* summarized these factors as follows:

(1) The debtor has few or no unsecured creditors;

(2) There has been a previous bankruptcy petition by the debtor or a related entity;

(3) The prepetition conduct of the debtor has been improper;

(4) The petition effectively allows the debtor to evade court orders;

(5) There are few debts to non-looming creditors;

(6) The petition was filed on the eve of foreclosure;

(7) single asset real estate cases;

(8) The debtor has no on-going business or employees;

(9) There is no possibility of reorganization;

12

(10) The debtor's income is not sufficient to operate;

(11) There was no pressure from the non-moving creditors;

(12) Reorganization essentially involves the resolution of a two-party dispute;

(13) A corporate debtor was formed and received title to its major assets immediately before the petition; and

(14) The debtor filed solely to create the automatic stay.

*In re Grieshop*, 63 B.R. at 663. See also *See Phoenix Piccadilly*, 849 F.2d at 1394-95; *McCormick*, 127 B.R. at 413; *In re Castleton Assocs., L.P.*, 109 B.R. 347, 351 (Bankr. S.D. Ind. 1989); *Grieshop*, 63 B.R. 657 at 663; *In re 4C Solutions, Inc.*, 289 B.R. 354 at 366 (Bankr. C.D. Ill. 2003) (citing *In re Hatcher*, 218 B.R. 441 (B.A.P. 8th Cir. 1998) in which the 8th Circuit Court of Appeal enumerated similar factors).

In *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986), the court noted that:

> Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities. Findings of lack of good faith... have been predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than on any single datum. Several, but not all, of the following conditions usually exist. The debtor has one asset, such as a tract of undeveloped or developed real property. The secured creditors' liens encumber this tract. There are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments.... Typically, there are only a few, if any, unsecured creditors whose claims are relatively small. The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court.

Here, the Debtor's bankruptcy filing is ripe with the hallmarks of a bad faith filing:

(a) the Debtor has identified the Insiders as the largest unsecured creditors, and the remaining four unsecured creditors have negligible claims;

(b) there was no pressure from unsecured creditors;

13

(c) the Debtor has only identified one secured creditor (First Midwest);

(d) The Debtor has no employees;

(e) the Bankruptcy Case was filed in response to the Foreclosure Litigation and mere days before the appointment of a Receiver to the Property;

(f) the Bankruptcy Case essentially involves the resolution of a two-party dispute (between First Midwest and the Debtor as it relates to the Property, the Debtor's sole asset);

(g) the Debtor filed the Bankruptcy Case solely to create the automatic stay (to avoid the continuation of the Foreclosure Litigation and the appointment of a Receiver);

(h) the Debtor commenced the Bankruptcy Case in an effort to hinder and delay First Midwest from exercising its rights and remedies under the Notes and the Mortgages; and

(i) there is no reasonable likelihood that the Debtor will successfully be able to reorganize within a reasonable period of time. The Debtor has no income whatsoever, and the Plan is predicated entirely on some future sale of the Property without any actual contract identified.)[2]

In the present case, and as set forth above, the Debtor's filing meets almost every single criteria courts consider to be a bad faith filing. Simply put, there could not be a more clear cut case that warrants a dismissal for cause than this one.

II. <u>Alternatively, First Midwest should be granted relief from the automatic stay pursuant to Section 362 of the Bankruptcy Code</u>

    a. <u>First Midwest is entitled to relief from the automatic stay for cause pursuant to 362(d)(1)</u>.

Pursuant to § 362(d)(1), "[a] secured creditor is entitled to relief from the automatic stay for cause, including the lack of adequate protection of an interest in property of such party in interest. The party requesting relief from the automatic stay has the burden of proof on the issue of the debtor's equity in the property. The movant can meet this burden by introducing evidence

---

[2] This Court should also note that the Debtor did not, and has not to date, filed a disclosure statement.

14

of debtor's continued failure to tender periodic payments on a secured debt." *Federal Nat. Mortg. Ass'n v. Dacon Bolingbrook Associates Ltd., Partnership*, 153 B. R. 204, 208 (N.D. Ill. 1993). In addition, "[l]ack of good faith itself, where established, constitutes cause for lifting the section 362 stay to permit foreclosure." *In re Novak*, 103 B.R. 403, 413 (Bankr. E.D.N.Y 1989).

Here, the Debtor's bad faith in filing the Petition, for the reasons described above, constitutes cause for lifting the stay. *See In re Phoenix Piccadilly, Ltd.* 849 F. 2d 1392, 1394 (5th Cir. 1988).

However, even if First Midwest had not established that the Debtor filed the Petition in bad faith, and it unequivocally did, First Midwest is still entitled to relief from the stay. Specially, First Midwest lacks adequate protection in the Property because the Debtor has not made any payments under the Final Construction Note since March 11, 2019, and the Revolving Note since June 5, 2019, nor has it made any adequate protections payments to First Midwest after filing for bankruptcy relief. Moreover, the Property is diminishing in value because there are no tenants paying any rent to the Debtor. Thus, First Midwest's interest in the Property is not adequately protected, and accordingly, it is entitled to relief from the automatic stay to pursue its rights as a secured creditor.

b.  <u>First Midwest is entitled to relief from the automatic stay for cause pursuant to § 362(d)(3).</u>

Section 362(d)(3) of the Bankruptcy Code provides the following basis for relief from the automatic stay in single asset real estate cases:

> "(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section...
>
> > (3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief...

15

(A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

(B) the debtor has commenced monthly payments that:

(i) may be made from rents or other income...; and

(ii) are in an amount equal to the interest at the then applicable non-default contract rate of interest on the value of the creditor's interest in the real estate.

Section 362(d)(3) of the Bankruptcy Code is meant to protect secured creditors by requiring single asset real estate debtors to act quickly, either by filing a confirmable plan within the prescribed timeframe or by compensating the creditor with statutory payments. *See In re RYYZ, LLC*, 490 B.R. 29, 34 (Bankr. E.D.N.Y. 2013).

Here, the Plan filed by the Debtor has no reasonable possibility of being confirmed because it is not feasible. Section 1129(a)(11) of the Bankruptcy Code requires the Debtor to establish that confirmation of the plan is not likely to be followed by the liquidation, or further financial reorganization of the debtor or successor debtor under the plan. "This requirement is commonly referred to as the 'feasibility test.'" *In re Mayslake Vill.-Plainfield Campus, Inc.*, 441 B.R. 309, 317 (Bankr. N.D. Ill. 2010). "Confirmation in Chapter 11 cannot be approved unless the bankruptcy judge make a specific finding that the proposed plan is feasible." *In re Olde Prairie Block Owner, LLC*, 467 B.R. 165, 169 (Bankr. N.D. Ill. 2012). "If the plan is not feasible, a bankruptcy judge need not consider other objections to confirmation." *Id.*

"[A] plan meets the feasibility standard only if it 'offers a reasonable prospect of success and is workable.'" *Id.* (quoting *In re Patrician St. Joseph Partners Ltd. P'ship*, 169 B.R. 669, 674 (D. Ariz. 1994)). "The central inquiry is 'whether there is a reasonable probability the provisions of the plan can be performed.'" *Id.* (quoting *In re G–I Holdings Inc.*, 420 B.R. 216, 267 (D.N.J.

16

2009)). "[S]incerity, honesty and willingness are not sufficient to make the plan feasible, and neither are visionary promises." *Id.* Rather, the feasibility test 'is firmly rooted in predictions based on objective facts.'" *Id.* (quoting *In re Hoff*, 54 B.R. 746, 752 (Bankr. D.N.D. 1985)).

The Debtor fails to provide any information sufficient for the Court to conclude that the Plan is feasible, let alone what the plan actually entails. There is no pending contract, nor is there even a letter of intent of a prospective purchaser. The Plan is entirely vague and speculative. It merely references a future sale of the property without any specifics, and the Court, thus, could not possibly confirm the Plan. *See In re Mayslake*, 441 B.R. at 323 (denying confirmation of plan that allowed single asset real estate debtor to sell portions of the property at its discretion post-confirmation without the consent of the lender).

WHEREFORE, First Midwest Bank, as successor-in-interest to Bridgeview Bank, respectfully requests that this Honorable Court grant its Motion to Dismiss this bankruptcy case, or in the alternative, to grant it relief from the automatic stay, and that the Court grant it any other and further relief which it deems just and equitable.

FIRST MIDWEST BANK,

By: */s/ Jillian S. Cole*
    One of its attorneys

William J. Serritella, Jr. (#6210001)
wserritella@taftlaw.com
Jillian S. Cole (#6279025)
jcole@taftlaw.com
Taft Stettinius & Hollister LLP
111 E. Wacker Dr., Suite 2800
Chicago, Illinois 60601
(312) 527-4000

26795021.1

17